**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| AMBIX INTERNATIONAL, INC.,<br>a Florida Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | 8:04CV342 |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| SAV-RX, L.L.C.,<br>a Nebraska Corporation, and<br>MELALEUCA, INC.,<br>an Idaho Corporation, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

This is an action to determine the parties' rights and responsibilities related to contracts for the marketing and maintenance of a discount prescription drug purchasing program. The court has jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. Pursuant to 28 U.S.C. § 636 and the consent of the parties,[1] the matter was tried to the undersigned magistrate judge February 21-23, 2006, whereupon the case was deemed submitted for decision.

## BACKGROUND

On February 1, 2001, Ambix entered into an agreement with Sav-Rx to market Sav-Rx's prescription discount program to large groups. *See* Filing No. 86 - Pretrial Order (PTO) p. 3. Ambix, through its president, marketed the discount program to Melaleuca, which culminated in an agreement being signed by Melaleuca and Sav-Rx on July 26, 2002. *Id.* The agreement specifically provides that Melaleuca will pay Ambix $7.00 for each enrolled member in the discount program. *Id.* The understanding between Ambix and Sav-Rx was that of the $7.00 Melaleuca was to pay per enrollee, Sav-Rx would be

---

[1]On November 1, 2004, United States District Judge Joseph F. Bataillon transferred this matter to the undersigned magistrate judge. **See** Filing No. 24.

entitled to $2.00 and Ambix would be entitled to the remaining $5.00. *Id.* Melaleuca has not paid $7.00 per enrolled member. *Id.* Melaleuca paid $3.50 per its reported enrollments as it was directed to do by Sav-Rx. *Id.* Sav-Rx invoiced Melaleuca for each of its reported enrollments and Melaleuca paid each invoice in full. *Id.* Ambix received payment of $61,586.50. *Id.*

On July 26, 2004, Ambix filed the instant action alleging claims against Sav-Rx and Melaleuca for breach of contract and unjust enrichment. **See** Filing No. 3 (Amended Complaint). Additionally, Melaleuca alleges claims against Sav-Rx based on a duty to defend and indemnify. **See** Filing No. 56 (Amended Answer and Counterclaim). The defendants contend Ambix's conduct related to the lower fee of $3.50 constitutes an accord and satisfaction of the contract claims. The issues remaining for trial are:

1. The number of enrollments made in the discount program.
2. Whether Melaleuca is required to pay $7.00 per enrollment.
3. Whether Ambix is entitled to $5.00 per enrollment.
4. Whether Ambix has waived its rights to any additional payments.
5. Whether Ambix did on January 3, 2003, enter into a binding agreement to accept $2.00 per enrollment instead of $5.00.
6. If the agreement to accept $2.00 per enrollment constitutes an accord and satisfaction.
7. Whether Sav-Rx is required to defend and indemnify Melaleuca.
8. The benefits to Sav-Rx and Melaleuca from the arrangement and agreements involved in this matter, under a theory of unjust enrichment.
9. Whether Ambix is entitled damages under a theory of unjust enrichment.
10. The amount of Ambix's damages.
11. Whether Melaleuca is entitled to attorney fees.

**See** Filing No. 86 - PTO p. 3.

Before trial, Ambix filed a trial brief (Filing No. 87) and proposed findings of fact and conclusions of law (Filing No. 92). Sav-Rx filed a trial brief (Filing No. 88). Melaleuca filed a trial brief (Filing No. 90) and proposed findings of fact and conclusions of law (Filing No. 89). At the conclusion of Ambix's case-in-chief, the defendants made oral motions for judgment as a matter of law, which the court took under advisement. **See** Filing No. 94 (court minutes); Trial Transcript (TR.) 438-454. On February 23, 2006, at the conclusion of the trial, the matter was deemed submitted.

## FINDINGS OF FACT

Based on the evidence presented and pursuant to Fed. R. Civ. P. 52(a), the court makes the following findings of fact:

Ambix International, Inc. (Ambix) was opened in 1997 as the national and international medical benefits marketing arm of one of Florida's top ten advertising agencies (PTO p. 1). The purpose of Ambix's formation (and that of its affiliate companies) was to develop specific, assigned marketing strategies for nationwide medical information data-storage clients and for physician/hospital networks operating within the medical information and healthcare or benefits management fields, and to procure contracted business for those clients on a commission basis (PTO p. 1-2). Specifically, Ambix creates presentation and marketing materials for discount medical benefits to member-based groups (TR. 33-36). Andrea Sass-Shaw (Sass) is the president and founder of Ambix (TR. 25-26, 32-33).

Sav-Rx, LLC is a national producer of managed care prescription services (PTO p. 2). Sav-Rx is a wholly owned subsidiary of A&A Drug Company, Inc. (*Id.*). Sav-Rx has more than 6.5 million members nationwide (*Id.*). Sav-Rx's pharmaceutical plans are marketed to employers, unions, affiliated groups and their members (*Id.*). Sav-Rx, through its affiliation with pharmaceutical manufacturers and large national pharmacy chains, has developed drug benefit plans to purchase prescription services (*Id.*). Both A&A Drug Company, Inc. and Sav-Rx maintain their corporate offices in Fremont, Nebraska (*Id.*). Its founder and largest shareholder is its president and chairman James Barta (Barta) (*Id.*; TR. 392). J.C. Pickard (Pickard) was previously president of Sav-Rx and the contact person at Sav-Rx who had decision-making authority regarding the Melaleuca discount program (TR. 53-54, 280). Lisa Quincy (Quincy), a Sav-Rx employee, worked with Pickard on the Melaleuca discount program, provided administrative assistance to the parties and became the account manager (TR. 280).

Melaleuca, Inc. is a direct marketing company (PTO p. 2). The company contracts with independent marketing executives (IMEs) to sell its various lines of nutritional, pharmaceutical, personal care, household cleaning and pet care products (*Id.*).

Melaleuca's office is located in Idaho Falls, Idaho with manufacturing and distribution centers in Knoxville, Tennessee and Idaho Falls, Idaho (**Id.**).

In late 2000 and early 2001, Sass, on behalf of Ambix, and Barta, on behalf of Sav-Rx, met to discuss a brokering arrangement for Sass to market Sav-Rx's prescription savings plans, or discount programs, to large groups (TR. 42, 430).  On February 1, 2001, Ambix entered into a broker's agreement with Sav-Rx (PTO p. 3).  The document titled Brokers Agreement sets forth the responsibilities of both Sav-Rx and Ambix, who is the broker (Exhibit 8).  The Brokers Agreement provides:

> Sav-Rx will provide all services to Plan Sponsor that have been contracted (the "Contracted Services") pursuant to the separate contracts which are made between Sav-Rx and Plan Sponsors.  The Contracted Services will include, without limitation:
>
> * * *
>
> (iii)   the full payment of program materials which include plastic ID cards, descriptive information brochures, and formularies for each participant enrolled by Plan Sponsors.  BROKER will oversee the actual preparation and printing of these materials after approval of the content and costs by Sav-Rx.

**See** Exhibit 8, p. 2 ¶ 2(A)(1).

Under the Brokers Agreement, the responsibilities of the broker section includes a subsection titled "Materials," but the subsection states only "To be determined" (**Id.** p. 3 ¶ 3(C)).  Sass understood the Brokers Agreement, as a whole, to mean that Sav-Rx was responsible for paying for the printing of promotional materials (TR. 50-51).  An attachment to the Brokers Agreement describes the charges associated with marketing materials including the membership card, letter, envelope and postage (**Id.** Attachment A p.1).  Sass admits it was her responsibility to see that the materials were prepared correctly and on time, however she denies it was her responsibility to "produce" them (TR. 147, 151).

The Brokers Agreement further provides:

> Sav-Rx agrees that all prospective Plan Sponsors introduced to Sav-Rx by BROKER will be included under this Agreement and that Sav-Rx will not contract directly or indirectly with any

> Plan Sponsors without compensating BROKER under the terms of this Agreement.

**See** Exhibit 8, p. 2 ¶ 2(A)(2).

An attachment to the Brokers Agreement states, "Any memberships and subsequent sales generated as a result of BROKER contact shall generate commission payments from Sav-Rx to BROKER" (*Id.* Attachment A p. 2). During their pre-contract discussions, Sass and Barta agreed that Ambix would earn a commission for any amount over $2.00 per cardholder which was agreed to by a plan sponsor (TR. 43-44, 430-31). At the time Ambix and Sav-Rx entered into the Brokers Agreement, Melaleuca was listed as a potential client, with whom Ambix had already approached (*Id.* Attachment B; TR. 53).

Sass was a Melaleuca member which allowed her to purchase Melaleuca products (TR. 55). Sass also had contact with Melaleuca IMEs (TR. 55-56). In February 2001, Sass presented the Sav-Rx program to Melaleuca through the use of a written proposal (TR. 61). Sass's contact at Melaleuca initially was Matt Udy (Udy), a marketing associate, and later was Brian Carmack (Carmack), vice president of business development for Melaleuca (TR. 61-62; Exhibit 36 at p. 5 (Carmack Depo.)). The discount program would allow Melaleuca members to purchase prescription pharmaceutical drugs at a 27 to 60 percent discount (TR. 64). Melaleuca was negotiating with other brokers for a pharmaceutical discount program and informed Sass the most important factors in choosing a program would be service and the number of pharmacies available, with cost being less of a concern (TR. 66). Sass informed Melaleuca that the cost of the program to Melaleuca was $7.00 per individual membership (TR. 69). Melaleuca determined a reasonable price for sale of the program to the members was $12.95 per membership (Exhibit 36 at 17; TR. 68). During the negotiations, Melaleuca informed Sass that it expected fifteen to forty percent of its approximately 270,000 members to purchase this type of discount program (TR. 67-68, 157-158, 277, 366). Therefore, Sass anticipated about 108,000 participants (TR. 153, 159). However, Sass had projected a more conservative eleven to thirty-one percent return rate (TR. 159).

On July 26, 2002, Melaleuca and Sav-Rx entered into a Prescription Services Pharmacy Benefits Agreement (Benefits Agreement) (Exhibit 9). The Benefits Agreement

5

covered a renewable three-year period to conclude on July 26, 2005 (*Id.* p. 3 ¶ 6). Sass testified she never received a written notice of breach under the terms of the Benefits Agreement (*Id.* p. 4 ¶ 6.4; TR. 70).

An attachment to the Benefits Agreement states:

> ADMINISTRATIVE FEES
> Fulfillment:   Provided by Sav-Rx; a one-time payment is made to Ambix International by MELALEUCA in the amount of $7.00 per cardholder

**See** Exhibit 9, Attachment A.

The parties stipulated this language means that Melaleuca would pay Ambix $7.00 for each enrolled member in the discount program (PTO p. 3). When Sass initially saw this term of the Benefits Agreement, she was surprised to learn Melaleuca was to pay Ambix directly, rather than Sav-Rx who would then pay Ambix (TR. 74-75, 162-163). Similarly, Carmack testified he understood Melaleuca would pay Sav-Rx directly as was the standard practice with vendors (Exhibit 314A at p. 43-44).

The understanding between Ambix and Sav-Rx was that of the $7.00 Melaleuca was to pay per enrollee, Sav-Rx would be entitled to $2.00 and Ambix would be entitled to the remaining $5.00 (PTO p. 3; TR. 72). Fulfillment means filling, addressing and mailing envelopes containing such materials as the membership card to the enrolled members (TR. 78). Sass understood from the Brokers Agreement that Sav-Rx was responsible for fulfillment in relation to the Benefits Agreement (TR. 78).

Ambix helped to prepare a customized membership card for Melaleuca (TR. 79-81). Sass testified that when Melaleuca requested that Ambix design the membership card, Sass agreed to do the work (TR. 80). Sass had been working on the designs since at least May 2002 (TR. 181). Melaleuca expected Ambix to prepare the membership materials (TR. 163). The design was ultimately approved by Melaleuca and by Sav-Rx (TR. 81). Ambix also designed the welcome packet including a brochure and welcome letter (TR. 81). Ambix researched printing companies on the basis of quality and price (TR. 81-82). One of these printing companies ultimately printed the membership cards (TR. 82). Ambix delivered the original materials to the printer (TR. 82).

6

Upon learning the Benefits Agreement was finalized, Sass wrote to Udy regarding approvals for the membership card (Exhibit 159). Sass also stated, regarding the membership materials, "We can get all the text entered and in progress before Monday morning. Edits and layout can be completed by the afternoon, so this should be an easy process" (*Id.*).

Melaleuca held its annual convention during the first week of August 2002, shortly after the Benefits Agreement was signed. Melaleuca offered the Sav-Rx discount program for sale at the convention (TR. 84). Sass was aware of the necessity of having the materials ready to distribute to the members at that time (TR. 131, 163). However, the welcome packets of membership materials were not yet finalized by the end of the convention (TR. 84). Sass testified the materials could not go to the printer because she did not have final approval from Sav-Rx until late August (TR. 84, 86). The executives at Melaleuca were concerned about why the materials had not been finalized (TR. 85). Ultimately, Sass sent the materials to Melaleuca or the printer (TR. 85). At that time, Melaleuca paid the costs for printing, which took twenty days (TR. 85-86).

On August 6, 2002, Sass sent a letter to Pickard objecting "to the terms for production of [Melaleuca's] membership materials as stated in your revised Attachment C [to the Brokers Agreement]" (Exhibit 147; TR. 171-172). Sass went on to say, "however under duress, I intend to honor Melaleuca's membership materials' parameters as we represented to them in numerous telephone conversations, conference calls, e-mails and meetings since I began soliciting them for business in February of 2001" (*Id.*). Sass explained "membership materials' parameters" relates to the content of the materials, but that Sass did not represent to Melaleuca she was going to have the materials printed and ready to go (TR. 173-174).

Also on August 6, 2002, Udy wrote to Sass about the complaints Melaleuca received from the members because when the members called Sav-Rx, the representatives said they had never heard of Melaleuca (Exhibit 143). Udy asked Sass to take care of the problem (*Id.*). Sass assured Udy by stating she was doing everything possible and "here ready to help and [ ] ready to continue running the bases" (*Id.*).

On August 9, 2002, Sass sent an e-mail to Barta stating:

> I have three times requested faxed copies of several important documents from JC [Pickard] and Lisa [Quincy] (e.g. written approval of Melaleuca's membership card layout, welcome letter and welcome brochure; signed Melaleuca contract dated 7/26/02; and revised/edited Brokers Agreement Attachment C). Receipt of these documents will permit me to move ahead with production of Melaleuca's membership cards, letter and brochure, per JC's delegation of this task to Ambix in your contract with Melaleuca.

**See** Exhibit 141 (emphasis added); **see also** Exhibit 151 (7/31/02 version of Attachment C).  Sass testified she had no "cause or obligation" to produce the membership materials unless Sav-Rx approved an addendum to the Brokers Agreement (TR. 170).

On August 14, 2002, Sass wrote to Wayne Reese, a Sav-Rx consultant, regarding Melaleuca's concerns about the delay of membership materials (Exhibit 132).  Again referencing the Brokers Agreement, Sass states, "Until I receive an acceptable contract attachment ("C") from JC [Pickering] that specifically outlines the accurate amounts payable/receivable, I'm not going forward with anything simply on a verbal understanding" (*Id.*).  Sass refused to go forward with the production of the membership materials until the dispute with Sav-Rx about who was responsible for production was resolved, in writing (TR. 184-186).  Sav-Rx never agreed to Attachment C (TR. 232; 264).  On August 15, 2002, Udy wrote to Pickard, with a copy to Sass, regarding the delay in sending out the membership materials, stating over 100 members made inquiries to Melaleuca (Exhibit 126).  Udy stated in the letter that Sass had not responded to an earlier inquiry (*Id.*).

On August 19, 2002, Sass wrote to Udy with specifications for the membership materials to assist Melaleuca in securing price quotes for production of the materials (Exhibit 105).  The letter also references a discussion between Carmack and Pickard on August 15, 2002, about offsetting production costs (*Id.*).  Although Sass understood Sav-Rx to be financially responsible for production costs, Sass offered to have the production costs deducted from her commissions on a temporary basis to get the materials completed (TR. 190-191).

On August 20, 2002, Sass requested information from Pickard about what the $2.00 fee paid by Ambix to Sav-Rx includes (Exhibit 93; Exhibit 102).  Sass stated Melaleuca's artwork and production was "at a standstill" pending an answer (Exhibit 102).  Sass

explains she was unsure about what services Sav-Rx would provide given Sav-Rx's conduct (TR. 192). Pickard responded by listing ten functions as the bases for the one-time fee (Exhibit 93). The list did not include either preparing or paying for the membership materials (*Id.*; TR. 193).

On August 21, 2002, Udy and Sass corresponded regarding some incorrectly ordered envelopes (Exhibit 89). Udy indicated Sass told them to order non-windowed envelopes, which Melaleuca did (*Id.*). However, windowed envelopes were required causing another two-day delay (*Id.*). Sass explained she obtained her information from Sav-Rx (TR. 197). In the letter, Udy states Melaleuca is "beyond the point of frustration" because of the delays in production and accompanying customer complaints (Exhibit 89; TR. 197-198). On August 22, 2002, Sass wrote to Carmack apologizing for the "contract misunderstandings and unexpected production issues" (Exhibit 79).

By August 28, 2002, the membership materials had not been completed (TR. 175). Sass wrote to Carmack stating, "I continue to do everything I can do to ameliorate the service dysfunction thus far" (Exhibit 73). Sass defined the service dysfunction as the problem of Melaleuca members calling about the failure of the Sav-Rx system to recognize new members and the delay of the membership materials (TR. 175). Further, the letter references Sav-Rx's refusal to pay for the membership materials and Sass's attempts to "pick up the pieces to keep the program in tact" (Exhibit 73; TR. 176). Sass testified that she meant she would take on the responsibility to produce the membership materials, but try to work out the problems with Sav-Rx later (TR. 178). However, Sass would not produce the materials until Sav-Rx agreed, in writing, that she could (TR. 178). Sass never produced the materials (TR. 179).

In response, Carmack wrote about problems with Ambix, as opposed to problems with Sav-Rx or the program:

> Our experience with your company thus far has been incredibly frustrating. . . . We were absolutely shocked when we returned from convention to find that nothing had been printed for customer distribution. . . . I could go on and on about the lack of information or the inconsistent information that we received from Ambix. . . . I could get very specific with our complaints, but it makes little difference at this point.

> As you can perceive, we are not happy with this service. We have lost our confidence in Ambix to service our account and would prefer to work directly with Sav-Rx. . . . Since we believe our joint relationship has changed, we want to pay a "finders fee" rather than for your on-going service. We ask that you give us a new proposal that would address a different fee structure per new customer acquired.
>
> We understand that you pay $2.00 to Sav-Rx. The original proposal was $7.00 to Ambix which we feel is unjustified for the extra time and effort we will need to put into this project. We look forward to your proposal.

**See** Exhibit 71.

Sass did not construe Carmack's August 28, 2002 letter as a notice of breach of contract because she had no service contract with Melaleuca (TR. 204-205). Sass felt the letter was based on a misunderstanding by Carmack (TR. 208). In fact, Quincy told Udy that "Andrea is responsible for the printing of both the letter and the brochure" (TR. 325-326; Exhibit 310). Quincy based this on her assumption that Ambix was responsible for the printing, rather than the actual terms of any contract (TR. 327-328). Further, Sav-Rx had no intention of paying for the printing because it did not involve Sav-Rx's standard card stock (TR. 349, 405-406). However, there is no evidence supporting Sav-Rx's position that either Melaleuca or Ambix knew about this financial limitation at the time of the subject agreements or after.

On August 29, 2002, Sass responded by requesting a buyout proposal from Melaleuca and Sav-Rx (Exhibit 65). However, Sass reiterates her position regarding her expectations under the previous contract - the Benefits Agreement (*Id.*; TR. 207). In response, Carmack sent a letter to Sass itemizing "just a few" of the problems with Ambix's "performance issues," causing Melaleuca to "prefer not to have launched this new service" (Exhibit 51). Carmack goes on to state "this has gone beyond our ability to cooperate with Ambix and rely on any information from Ambix" and to suggest Ambix be paid $1.00 per enrollment, rather than $5.00 (*Id.*). On September 18, 2002, Sass wrote to Carmack trying to clear up some of Carmack's misunderstandings about Ambix's performance, but reiterating her desire to adhere to the terms of the Benefits Agreement and the Brokers Agreement (Exhibit 45).

On September 25, 2002, Carmack responded to Sass's September 18, 2002 letter (Exhibit 25).  Carmack stated that Melaleuca had lost respect for Sass's integrity and that they would not work with her at all (*Id.*).  Carmack stated his "long term expectations were to pay [Ambix] for introduction to the program, preparation and launch of the program, and on-going support.  Only one of three areas were delivered by you" (*Id.*).  Carmack again stated they would pay Ambix an amount per each enrollment based on Ambix's participation, but less than the contract amount (*Id.*).  Also on September 25, 2002, Ambix sent Melaleuca an invoice for $7.00 for each of 9,632 enrolled members less a credit for printing costs (Exhibit 7).  Melaleuca did not pay the invoice (TR. 89).  On September 27, 2002, Sass suggested that she, Carmack and Pickard participate in a conference call to determine whether they could "come to a successful modification of earlier written agreements without crossing the line to an adversarial position" (Exhibit 23).

During the course of the parties' business relationship, e-mails were exchanged regarding terms of the relationship which were not included in the agreements.  Specifically, Melaleuca would pay for enrollments every thirty days based on the number of membership cards mailed out (Exhibit 112; Exhibit 227 (attached proposed letter of understanding regarding payment terms)).  Also, the parties agreed to a thirty-day refund period for the enrollees (TR. 222).

As of January 2, 2003, Ambix had not been paid any of its commission payments although Sass had been actively seeking payment (TR. 93-94).  Sass no longer corresponded with Melaleuca regarding the dispute (TR. 248, 258).  On January 3, 2003, Barta called Sass regarding the status of the commission payments (TR. 94).  Sass said to the secretary, then to Barta, "I hope its about a fucking check!"  (TR. 99).  Sass demanded that Barta deal with Sass, rather than ignore her and the problem (TR 96).  Barta explained that the Melaleuca discount program was limping along and needed to be energized (TR. 96).  Barta explained Melaleuca was unhappy with the price of the discount program, but did not complain about the service by Ambix or the benefits (TR. 104).  Barta stated he could get Ambix $2.00 per enrollment (TR. 96-97).  When Sass agreed to take $2.00, Barta agreed to have a check send out overnight (TR. 97).

11

Sass understood the $2.00 per enrollment payment as a temporary partial payment, with temporary meaning a few months (TR. 97, 111).  Sass testified that, on January 3, 2003, she stated to Barta, "I in no way, shape or form accept that this $2 payment is to be misconstrued or construed as a payment in full for my commission amount that is in my contract."  (TR. 98).  According to Sass, Barta assured Sass the remainder of the funds would be "ironed out" with Carmack and Pickering (TR. 100).  Sass was not explicitly notified of a breach of contract, but Melaleuca demanded an apology (TR. 97).

In contrast, Barta understood the January 3, 2003 telephone call differently.  Barta became involved after learning about problems between Melaleuca and Ambix from Pickard and Quincy (TR. 404-405, 417-18).  Barta decided to attempt to work out a solution in order to prevent Melaleuca from failing to offer the discount program to its members (TR. 418-419).  Barta understood the Benefits Agreement to allow Melaleuca to just fail to offer the discount program to its members, without being in breach, resulting in no commissions to Sav-Rx (TR. 404, 413).  Barta stated he arrived at the new commission amount on his own, based on his determination of a fair price (TR. 420).  Barta testified he offered Sass the reduced fee as a take-it or leave-it option, without a negotiation, in order to salvage the program (TR. 410).  Further, Barta had no intention for the reduced commission amount to be either a temporary or partial payment (TR. 426-427).  No written amendment to the either the Benefits Agreement or the Brokers Agreement followed the January 3, 2003, telephone call (TR. 101, 407).

Melaleuca agreed to change its cost of the program from $7.00 to $3.50 per enrollment and, specifically, to change Ambix's commission from $5.00 to $1.50 per enrollment (Exhibit 36 at p. 20, 26-27).  Sav-Rx sent Melaleuca invoices consistent with this agreement, including recouping the back payment amounts for Ambix, from January 2003 through 2005 (Exhibit 247 to 249; TR. 299).[2]  Previously, from September 13, 2002, until January 2003, Sav-Rx billed Melaleuca for "card fulfillment" at $2.00 per card (Exhibit 246).  Quincy confirmed the billing arrangement by e-mail on January 21, 2003, stating, "[Sass] has agreed to the $1.50 per card.  We have already paid her for the bulk of the cards,

---

[2]The first invoice billing for Ambix's commission is dated November 11, 2002, but the date is an administrative error as the invoice was sent in January 2003 (TR. 320-321; Exhibit 247).

5612, which you will see a bill for her portion.  We will begin to bill for $3.50 for each card and we will pay her directly from here" (Exhibit 242).

Ambix received a commission check in January 2003 for $2.00 per enrollment for 5,612 enrollments from the beginning of the program through the end of 2002 (Exhibit 221). On February 3, 2003, Sass wrote to Barta regarding the January 3, 2003 telephone call (Exhibit 316; TR. 105).  The letter states, in part:

> I am still in a quandary with Sav-Rx's handling of the events that have transpired since Melaleuca introduced the program to their membership last August, and in no way imply that I accept any waiver or alteration to the contracts in effect – which we discussed when we spoke.
> * * *
> We still need to iron out those wrinkles [discussed on January 3, 2003] to bring this temporary "energizing period" to fruition for our mutual client, Melaleuca – and get back to the contractual agreement's terms.
> * * *
> I want to firm up where we stand at present, having already provided my element of the temporary solution to the impasse as noted above.  In addition to a discussion addressing a timeline successfully crossing the impasse (a few months' period) . . . .

**See** Exhibit 316.

On February 11, 2003, Sass sent an e-mail to Quincy at Sav-Rx alerting her to a payment error on Sav-Rx check number 1335 (Exhibit 244).  The e-mail states, "if you could refer to your cost card on the Mel-project, we (Jim & myself) were working with $2.00/new enrollee, as I am sure that the missing .50 each is an oversight . . ." (*Id.*).  Sass explains the check was for $1.50 per enrollment rather than the $2.00 per enrollment discussed by Sass and Barta (TR. 109).  Sass did not feel it was appropriate to explain the entire dispute or elaborate the details to Quincy, who sent out the commission checks but was not a decision maker for Sav-Rx (TR. 110-111).  Sass noted the payment oversight to Barta in a fax dated February 13, 2003, where she asked Barta to tell Quincy the commission checks should be for $2.00 per enrollee (Exhibit 236).  Sass did not indicate the $2.00 amount was a temporary or partial payment in either correspondence.  Sass did not think the commission checks she received constituted payment in full under the

contract (TR. 111). Sass accepted the $2.00 per enrollee payments from January 2003 until the end of the program (TR. 238-239).[3]

However, Sass contacted Barta by telephone in late June or July to request full payment under the terms of the contract (TR. 111-112). On August 12, 2003, Sass wrote to Barta requesting the balance of the $5.00 per enrollment on 31,233 enrollments, "roughly $93,000.00" (TR. 272; Exhibit 292; Exhibit 302 (similar August 18, 2003 letter)). On August 22, 2003, Sass traveled to Fremont, Nebraska, "to get these wrinkles ironed out once and for all. . . with the intention of collecting a check" (TR. 112-113). Sass had informed Pickard, Barta and Mark Hechinger (Hechinger), who was Vice President and General Counsel for Sav-Rx, of her arrival by sending them a fax, FedEx, courier and e-mail (TR. 113). Sass first drove to Barta's residence, then to the Sav-Rx office (TR. 113-114). Sass asked to see Barta, but was informed he was out of town (TR. 114). Sass met with Hechinger who stated he did not know Sass was coming to town (TR. 114). Sass went outside and saw the receptionist, who she believed to be Barta's daughter, get into a car and speak on a cellular telephone for approximately twenty minutes (TR. 114-115). Ten minutes later, Hechinger called Sass and stated that Barta was now in town (TR. 115). Sass stated that was "super" and she was not leaving town until he met with her (TR. 115). Sass and Barta met briefly at the Sav-Rx office, then spoke over dinner (TR. 115-116). Sass testified Barta told Sass "he would see to it that we get you the rest of your money" (TR. 116). Sass understood this to mean the additional $3.00 per enrollment (TR. 116). The meetings were amicable (TR. 117). In contrast to Sass's understanding, Barta testified that in his mind the Melaleuca "deal was done" and he would not have reopened the "settled" issue or indicated the $2.00 commission was a partial payment (TR. 407). Barta did not contact Melaleuca about the meetings or correspondence from Sass after January 2003 (TR. 422-423).

On October 15, 2003, November 3, 2003, and November 11, 2003, Sass again wrote to Barta regarding lack of payment (Exhibit 303; Exhibit 305; Exhibit 294; TR. 118-119, 273). The November 3, 2003 letter specifically referenced the "deferred 'obligations'

---

[3]It appears from the record Ambix was paid $2.50 per enrollment for 153 enrollments from September to December 2003, with no explanation (Exhibit 221).

remaining due to [Ambix]" (Exhibit 305).  On November 12, 2003, Hechinger responded stating, among other things, "While the parties may have originally discussed the fee of $7 per card, that was not the ultimate agreement" (Exhibit 15).  The November 12 letter references Sass's February 13, 2003 correspondence where she "agreed to accept a commission of $2.00 per card" (*Id.*)  Sass responded on November 25, 2003, asking Hechinger to talk to Barta about the August, 2003 discussions (Exhibit 14).  Sav-Rx declined to revisit the $7.00 fee issue and stated that "Ambix International has been compensated fairly and in full pursuant to the agreement that was reached between Sav-Rx and Ambix earlier this year" (Exhibit 13).

The Brokers Agreement contains the following paragraph regarding modification:

> Except as otherwise set forth herein, this Agreement may be amended, modified, or supplemented only by mutual consent set forth in writing duly signed by the parties hereto. Notwithstanding the foregoing, the parties acknowledge that Sav-Rx, BROKER, and this Agreement are subject to the laws, rules, and regulations of the State of Nebraska and the parties shall amend this Agreement from time to time as may be required by such laws, rules, or regulation or the regulatory bodies responsible for implementing and enforcing such laws.

**See** Exhibit 8, p. 7 ¶ 16.  Similarly, the Benefits Agreement provides it "may not be amended or modified by either party without the express written consent of the other, except as otherwise provided in the Agreement" (Exhibit 9, ¶ 13).  Sass testified she is not aware of any writings by mutual consent which amend the Brokers Agreement or any written amendments to the Benefits Agreement (TR. 52, 71).

Melaleuca has never paid $7.00 per member enrolled in the discount program (PTO p. 3).  Melaleuca paid $3.50 per its reported enrollments as it was directed to do by Sav-Rx (*Id.*).  Sav-Rx invoiced Melaleuca for each of its reported enrollments and Melaleuca paid each invoice in full (*Id.*).  Ambix received total payments of $61,586.50 (*Id.*).

### Number of Cardholders

For the duration of the discount program, Melaleuca sent an electronic file to Sav-Rx called a "daily download" (TR. 307-308; 362-363).  These files contained information about the Melaleuca members who enrolled in the discount program, including person contact

information and the duration of the membership (Exhibit 27).  Melaleuca sent over 59,000 entries to Sav-Rx from August 2002 until the end of the discount program (TR. 307).  The number of entries reflects the enrollment of members and administrative changes to their accounts, such as address or name changes (TR. 308).  The number of entries does not reflect the total number enrollees.

Sav-Rx billed Melaleuca for 33,274 cards, which represents 34,366 cards sent out minus 1,092 credits for returns (Exhibit 221).  Sav-Rx billed Melaleuca based on the number of cards sent out, rather than the number of members who enrolled in the discount program (TR. 309, 310-311, 314-15).  For example, Sav-Rx billed Melaleuca for a card if an enrollee needed a replacement card (TR. 314-15).  The number of cards sent out or the number of cards billed to Melaleuca does not reflect the total number of enrollees.

Sav-Rx determined the number of "eligible members," which is the number of Melaleuca members who applied for the discount program benefits, was approximately 28,000 people (TR. 311).  Sav-Rx made this determination based on the number of unique identification numbers contained in a data file similar to the daily downloads (TR. 313-314, 337-340;  **see, e.g.,** Exhibit 27).  Additionally, in order to ascertain the total number of enrollees, Melaleuca searched their electronically stored data for the number of Melaleuca members who had ordered a particular SKU or product number, which was associated with the discount program (TR. 363-365; Exhibit 28).  Based on this search, 28,875 members enrolled in the discount program (TR. 363-365; Exhibit 28).

Based on the above factual background, Ambix seeks a complete accounting of the discount program to determine to correct number of enrollees in the program.  Further, Ambix alleges Melaleuca and Sav-Rx breached their duties under the Benefits Agreement by failing to pay Ambix $7.00 per enrollment.  Finally, Ambix contends it is unconscionable to allow Melaleuca and Sav-Rx to retain benefits from the discount program and avoid paying Ambix for the value received.  The defendants deny they have breached the Benefits Agreement.  The defendants allege Ambix has been fully compensation based on either a modification of the Benefits Agreement or an accord and satisfaction.  Melaleuca also alleges Sav-Rx is bound to indemnify and defend Melaleuca because Sav-Rx represented the parties' dispute had been resolved.

## CONCLUSIONS OF LAW

Nebraska contract law governs this diversity action.  Ambix is a third-party beneficiary to the Benefits Agreement.  **See *Spring Valley IV Joint Venture v. Nebraska State Bank of Omaha***, 690 N.W.2d 778, 782 (Neb. 2005) ("Beneficiaries of a contract may recover thereon, though not named as parties, if it appears by express stipulation or by reasonable intendment that the rights and interests of the unnamed parties were contemplated and provision was being made for them.").

Under Nebraska law, the interpretation, construction and effect of a contract are determined as a matter of law unless the contract is ambiguous.  ***Guerrier v. Mid-Century Ins. Co.***, 663 N.W.2d 131, 135 (Neb. 2003).  The determination of whether a contract is ambiguous is a question of law, but the interpretation of an ambiguous contract is a question of fact.  ***Plambeck v. Union Pac. R.R. Co.***, 509 N.W.2d 17, 20 (Neb. 1993).  "A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings."  ***Guerrier***, 663 N.W.2d at 135.   "Because the parties to a document have or suggest opposing interpretations does not necessarily, or by itself, compel a conclusion that the document is ambiguous."  ***Kluver v. Deaver***, 714 N.W.2d 1, 6 (Neb. 2006).  The court has a duty to "fastidiously guard against the invitation to create ambiguities where none exist."  ***Edgley v. Lappe***, 342 F.3d 884, 888 (8th Cir. 2003).

A latent ambiguity may exist where the contract is silent on a subject or based on undisclosed facts or uncertainties of the written instrument.  **See *Jet Asphalt & Rock Co., Inc. v. Angelo Iafrate Const., LLC***, 431 F.3d 613, 617 (8th Cir. 2005).  Further, "[a] latent ambiguity exists when collateral facts make the meaning of the contract uncertain."  ***Kluver***, 714 N.W.2d at 6.  The Nebraska Supreme Court gave an example of a latent ambiguity by describing a contested will such that "if two or more persons satisfy a description of one devisee, there is a latent ambiguity, and extrinsic evidence is admissible to disclose and remove that ambiguity."  ***Plambeck v. Union Pacific RR. Co.***, 509 N.W.2d 17 (1993); **see also *Gary's Implement, Inc. v. Bridgeport Tractor Parts, Inc.***, 702 N.W.2d 355 (Neb. 2005) (agreements considered together contained a latent ambiguity about a non-competition agreement).  Here, there is not a latent ambiguity that makes

17

extrinsic evidence necessary.  Instead, the  parties dispute the interpretation of the terms within the contract about who was required to pay for and produce the membership materials.  However, the plain language of the agreements control.

If a contract is unambiguous, the contract language must be given its "plain and ordinary meaning as the ordinary or reasonable person would understand them." ***Guerrier***, 663 N.W.2d at 134.  When interpreting the plain meaning of the terms of an insurance policy, Nebraska courts have stated "the natural and obvious meaning of the provisions in a policy is to be adopted in preference to a fanciful, curious, or hidden meaning.  [And] that [w]hile for the purpose of judicial decision dictionary definitions often are not controlling, they are at least persuasive that meanings which they do not embrace are not common." ***Katskee v. Blue Cross/Blue Shield of Neb.***, 515 N.W.2d 645, 649 (Neb. 1994).  A contract must be construed as a whole, and if possible, effect must be given to every part thereof.  ***Big River***, 681 N.W.2d at 756.

The Benefits Agreement unambiguously states:

ADMINISTRATIVE FEES
Fulfillment:   Provided by Sav-Rx; a one-time payment is made to Ambix International by MELALEUCA in the amount of $7.00 per cardholder

**See** Exhibit 9, Attachment A.

Melaleuca did not make payments to Ambix, nor did Melaleuca pay $7.00 per cardholder.  Melaleuca contends the terms of the agreement changed due to waiver, modification, accord and satisfaction or estoppel.

**A.     Waiver/Modification**

"[W]aiver is the voluntary and intentional relinquishment or abandonment of a known existing legal right, or conduct which warrants an inference of relinquishment of such a right.  To establish waiver of a legal right, there must be clear, unequivocal, and decisive action by the party which demonstrates such purpose, or acts amounting to estoppel." ***Katskee v. Nevada Bob's Golf of Nebraska, Inc.***, 472 N.W.2d 372, 376 (Neb. 1991) (citations omitted).  Furthermore, "[a] written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations

18

manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the party's intention to waive." *Id.*

In addition to waiver, "[t]he terms of a written executory contract may be changed by a subsequent parol agreement prior to any breach of such contract." ***Atokad Agr. & Racing Ass'n v. Governors of the Knights of Ak-Sar-Ben***, 466 N.W.2d 73, 78 (Neb. 1991), overruled on other grounds, ***Eccleston v. Chait***, 241 Neb. 961, 492 N.W.2d 860, 862 (1992). Such "modification of a contract which substantially changes the liability of the parties ordinarily requires mutual assent to be effective." *Id.* However, "[i]t is not essential that the mutual assent of the parties to modify the contract be express . . . it may be implied from acts and circumstances . . . from a course of conduct . . . and from acts of one party in accordance with the terms of a change proposed by the other." *Id.* (**quoting** 17A C.J.S. Contracts § 375 at 427 (1963)). "[T]he silence of a contracting party to a proposed modification leaves the contract unmodified." ***Solar Motors, Inc. v. First Nat'l Bank of Chadron***, 545 N.W.2d 714, 721 (Neb. 1996). Finally, "a contract made for the benefit of a third party with the third party's knowledge ordinarily cannot be changed without the third party's approval." ***Whorley v. First Westside Bank***, 485 N.W.2d 578, 581 (Neb. 1992).

Ambix and Melaleuca were both surprised by the term in the Benefits Agreement stating the payments were to be made directly to Ambix. Melaleuca began to make payments directly to Sav-Rx in September 2002, for an amount equal to what Ambix was going to pay Sav-Rx, $2.00 per card. Melaleuca disregarded the invoice from Ambix and never paid Ambix directly. Ambix did not require adherence to the contract on that term, but later Sass agreed with Barta to accept payment through Sav-Rx. Accordingly, the court finds no breach of contract related to the payee term under the Benefits Agreement. The parties either waived or modified the payee term under the Benefits Agreement. The manner of the change of payee is an example of the parties' waiver of another term of the contract, the term requiring a written amendment or modification.

The payment term at issue in this case is the amount due from Melaleuca to Ambix, regardless of whether it went through Sav-Rx. The amount due is affected by more than just the contract term requiring Melaleuca to pay $7.00 per cardholder. In addition to the

conduct of the parties with regard to the other terms, the Benefits Agreement must be read consistent with the Brokers Agreement and later agreements.

The defendants contend Ambix was in breach of contract when it failed to pay for and produce the membership materials. The Benefits Agreement required no such conduct on the part of Ambix. Further, Melaleuca, at some point, assumed it had contracted (with Sav-Rx) to pay Ambix "for introduction to the program, preparation and launch of the program, and on-going support" (Exhibit 25). Again the Benefits Agreement did not assign these burdens to Ambix. **See *Murphy v. City of Lincoln***, 515 N.W.2d 413, 416 (Neb. 1994) ("This may not be the bargain the [defendant] intended to strike, but it is bound by the agreement it made, not the agreement it thought or hoped it had made.") (**citing *Husen v. Husen***, 487 N.W.2d 269 (1992) (while one may be dissatisfied with the bargain, it is not for court to rewrite the contract)).

The Benefits Agreements states "Fulfillment" Provided by Sav-Rx" (Exhibit 9, Attachment A). Additionally, the Brokers Agreement, of which Melaleuca had not seen at the time, specifically states that "Sav-Rx will provide all services to Plan Sponsor . . . includ[ing], without limitation: . . . (iii) the full payment of program materials which include plastic ID cards, descriptive information brochures, and formularies for each participant enrolled by Plan Sponsors" (Exhibit 8, p. 2 ¶ 2(A)(1) (emphasis added). The only duties on the part of Ambix under the Brokers Agreement were to introduce Plan Sponsors to Sav-Rx and to "oversee the actual preparation and printing of [program] materials after approval of the content and costs by Sav-Rx" (Exhibit 8, p. 2 ¶ 2(A)(1) (emphasis added)). The agreements unambiguously require Sav-Rx to provide all services to Plan Sponsors and to pay for program materials.

Sav-Rx relies on the testimony of Quincy and Barta regarding Sav-Rx's general practice of providing (or paying) for program materials printed on standard cardstock. However there is no evidence of a written or oral agreement between the parties in this case about who will pay for Melaleuca's personalized program materials, aside from the unambiguous language in the Brokers Agreement. Further, while there was some evidence of a delay by Sav-Rx in approving the content of the program materials, there was no evidence Sav-Rx ever approved the cost. Even had Ambix agreed to undertake the

production and cost of the materials, approval by Sav-Rx was required under the Brokers Agreement.  Accordingly, Ambix was not under a duty to perform "the actual preparation and printing of [program] materials."

The defendants have the burden of proving modification of the written contract. **Skinner Mfg. Co. v. Carrier Eng'g Corp.**, 203 N.W. 585, 587 (Neb. 1925); **see Atokad Agr.**, 466 N.W.2d at 77-78; **see also Schuelke v. Wilson**, 587 N.W.2d 369, 374 (Neb. 1998) ("the burden of proving an affirmative defense rests upon the party alleging the defense").  The evidence before the court shows mutual consent to modify the Benefits Agreement in more than one way, however the defendants fail to establish modification of the commission amount.  The evidence shows that in January 2003, Sass agreed to accept $2.00 per enrollment on at least a temporary basis as a partial payment of the commissions due to Ambix.  At that time, Ambix had not been in breach of the Benefits Agreement or the Brokers Agreement, but had not been paid any amount by either Sav-Rx or Melaleuca. Sass gave an express agreement to accept the partial payment, then as time went on she repeatedly sought to return to the original fee agreement.  Other than correcting an error made by Quincy, Sass's conduct did not conform with the terms of the modification alleged by the defendants.  Although Barta and Melaleuca assumed the modification was a "done deal," Sass continued to express her concern and desire to earn the commissions set in the original fee agreement, by explicit writings and meetings.  Accordingly, the defendants fail to meet their burden of showing mutual assent of the parties to modify the contract.

Melaleuca is in breach of the Benefits Agreement, which requires Melaleuca to pay $7.00 per cardholder.  Similarly, Sav-Rx is in breach of its agreement with Ambix to pay the commissions.  Ambix is entitled to $5.00 per cardholder based on 28,875 enrolled members.  Since Ambix already received $61,586.50, Ambix is entitled to $82,788.50.

## B.   Unjust Enrichment

Ambix contends that since the benefits of the enrollments have been retained by the defendants, it is inequitable and unconscionable to allow the defendants to avoid payment to Ambix for the value the defendants received due to the actions of Ambix.  Ambix, however is not entitled to damages under a theory of unjust enrichment because:

> The doctrine of unjust enrichment is recognized only in the absence of an agreement between the parties. The doctrine does not operate to rescue a party from the consequences of a bad bargain. In other words, the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract.

*Washa v. Miller*, 546 N.W.2d 813, 818-19 (Neb. 1996); **see** *Stark v. Soteria Imaging Services, Inc.*, 276 F. Supp. 2d 989, 993-94 (D. Neb. 2003). Since the parties entered into agreements regarding the amount of commission fees due to Ambix, no valid claim for unjust enrichment exists.


**C.   Accord and Satisfaction**

Melaleuca argues Ambix may not now sue to recover under the original contract for $5.00 per enrollment commissions because any obligation for such amounts was discharged by an accord and satisfaction. Sav-Rx joins in Melaleuca's argument (Filing No. 60). Under Nebraska law,

> An accord and satisfaction is a discharge of an existing indebtedness by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant in full satisfaction of the claim. To constitute an accord and satisfaction, there must be (1) a bona fide dispute between the parties, (2) substitute performance tendered in full satisfaction of the claim, and (3) acceptance of the tendered performance. The key element of accord and satisfaction is the intent of the parties.

*Mischke v. Mischke*, 571 N.W.2d 248, 256 (Neb. 1997) (internal citation omitted).

Melaleuca argued Ambix breached an agreement between the parties by Ambix's failure to produce and pay for the program membership materials. Melaleuca's argument is that this alleged breach created a dispute about whether Ambix was entitled to the full commission. Since the court finds Ambix did not breach the agreement, the court must determine if there was some other bona fide dispute between the parties. The court finds none. It is clear the contractual relationship of the parties did not run smoothly. Delays and/or misinformation originated from each party increasing frustration and tempers about the project. However, Ambix's conduct was consistent with its contractual duties. That is

not to say that had the principal players handled the problems differently or exhibited different personality types there would have been a more pleasant outcome. Because Ambix substantially performed its duties under the Brokers Agreement and had no express duties under the Benefits Agreement, no bona fide dispute between the parties existed.

Melaleuca contends Ambix and Sav-Rx reached an agreement on January 3, 2003, to amend the earlier contract to reduce the commissions owed to Ambix and Sav-Rx for the prescription savings plan. Melaleuca argues Ambix accepted the reduced commission in order to prevent the complete loss of the agreement with Melaleuca. While Ambix may have accepted the reduced commission amount, in some form, to prevent Melaleuca from abandoning the program, any such agreement was not in exchange for duties under the Benefits Agreement. Finally, the court finds insufficient evidence exists of Ambix's acceptance of the reduced commission as full satisfaction of the contract claims. Accordingly, the court concludes no accord and satisfaction took place with regard to Ambix's acceptance of the $2.00 commission payments.

## C.     Estoppel

Based on the January 3, 2003 agreement between Ambix and Sav-Rx, Melaleuca argues Ambix should be estopped from claiming damages under the original contracts. Melaleuca relies on the principle of quasi estoppel.

> The doctrine classified as quasi estoppel has its basis in election, ratification, affirmance, acquiescence, or acceptance of benefits, and the principle precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him. The doctrine applies where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit.

*Lane v. Burt County Rural Public Power Dist.*, 77 N.W.2d 773, 780 (Neb. 1956) (**quoting** 31 C.J.S., Estoppel, § 107, p. 341).

Melaleuca argues Ambix is now taking a position contrary to the January 3, 2003 agreement to a reduced commission. Further, Melaleuca states it relied on the agreement and any reverting back to the original commission schedule would be to its disadvantage.

23

Finally, Melaleuca contends that allowing Ambix to maintain an inconsistent position would be unconscionable.

In contrast, Ambix asserts its position is the same now as it was in January 2003, that the agreement to a reduced commission was temporary.  Further, Ambix contends the underlying contracts were not modified and Ambix did not waive its rights under the previous agreements.

The court finds insufficient evidence that Ambix intended the reduced commission to continue for the duration of the contract period.  Additionally, Melaleuca was aware of and involved in many negotiations with Ambix and Sav-Rx, as well as being involved in the underlying dispute.  Melaleuca cannot rely on an admittedly erroneous e-mail message from Quincy, who had misinformed Melaleuca about critical issues on other occasions. Under the circumstances of this case, it would not be unconscionable to allow Ambix to maintain its current position regarding the commissions.  Accordingly, the court concludes quasi estoppel does not apply in this case.


**D.     Duty to Defend and Indemnify**

In a letter dated August 13, 2004, Melaleuca requested that Sav-Rx undertake the defense of Melaleuca in this lawsuit and indemnify Melaleuca for damages.  Melaleuca contends that equity requires that Sav-Rx indemnify Melaleuca for any liability to Ambix. Melaleuca argues it was not a party to the January 3, 2003, agreement between Sav-Rx and Ambix.  Melaleuca contends it merely relied upon Sav-Rx's representation that the controversy had been resolved.  Further, Melaleuca states it followed Sav-Rx's directions to pay the Sav-Rx invoices, which were priced in accordance with the January 3, 2003 agreement.  Melaleuca also alleges the January 3, 2003 agreement "undoubtedly helped to convince Melaleuca to continue with the program."

"Under Nebraska law, indemnification is available when one party is compelled to pay money which in justice another ought to pay, or has agreed to pay, unless the party making the payment is barred by the wrongful nature of his conduct."  ***Warner v. Reagan Buick, Inc.***, 483 N.W.2d 764, 771 (Neb. 1992).  The ***Warner*** court explained, that "[i]n the

tort context, we have held that indemnity is available to one who engaged in merely passive neglect, but unavailable to one who engaged in direct and active negligence." *Id.*

The court concludes Melaleuca engaged in direct and active negligence with regard to the dispute culminating in the January 3, 2003 reduced commission and ultimately this lawsuit. Melaleuca was operating under an erroneous perception of Ambix's duties under the written contract and turned over the dispute to Sav-Rx, rather than pay the commission amounts due. Melaleuca essentially buried its head in the sand to avoid negotiating with Sass. Sav-Rx stepped in and attempted to ameliorate the parties' relationship, without success. The evidence is not consistent with Melaleuca's assertion that if no agreement were reached it would have abandoned the program.

Under the circumstances of this case there is nothing in any contracts, agreements, negotiations or dealings to support the theory that Sav-Rx is required to defend and indemnify Melaleuca. Melaleuca was aware of the negotiations leading to the January 3, 2003 agreement and cannot now disavow any responsibility for the result. Accordingly, Sav-Rx has no duty to defend or indemnify Melaleuca on the claims presented by Ambix. Similarly, Melaleuca is not entitled to attorney fees. Upon consideration,

**IT IS ORDERED:**

1.    Judgment will be granted in favor of the plaintiff Ambix International and against the defendants Sav-Rx, Inc. and Melaleuca, Inc. on the plaintiff's claims for breach of contract in the amount of $82,788.50.

2.    Judgment will be granted in favor of the defendants and against the plaintiff on the plaintiff's claim for unjust enrichment.

3.    Judgment will be granted in favor of the defendant Sav-Rx, Inc. and against the defendant Melaleuca, Inc. on Melaleuca Inc.'s claims for duty to defend and indemnify.

3.    The defendants' oral motions for judgment as a matter of law are denied.

Dated this 5th day of July, 2006.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge